UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

REAL PROPERTY LOCATED AT
900 BISCAYNE BLVD UNIT #6107,
MIAMI, FLORIDA 33132,

      Defendant *In Rem*.

_____/

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

The United States of America by its attorneys, Woo S. Lee, Teresa C. Turner-Jones, and Shai D. Bronshtein, Criminal Division, United States Department of Justice, and Adrienne E. Rosen, United States Attorney's Office for the Southern District of Florida, and in accordance with Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, brings this complaint for forfeiture *in rem* and alleges the following:

## NATURE OF THE ACTION

1.     This is a civil action *in rem* to forfeit assets involved in and traceable to an international conspiracy to launder money embezzled from Société Nationale des Pétroles du Congo, the state-owned oil company of the Republic of the Congo ("Congo").

2.     The embezzled funds were used to purchase real property located in the Southern District of Florida, namely, real property located in a condominium residence at 900 Biscayne Boulevard, Unit #6107, Miami, Florida 33132 (the "Miami Property" or the "Defendant Asset").

1

3.      The United States seeks forfeiture of the Defendant Asset pursuant to 18 U.S.C. § 981(a)(1)(C), because the funds used to acquire and maintain it are traceable to violations of U.S. law and specified unlawful activity.

4.      The United States also seeks forfeiture of the Defendant Asset pursuant to 18 U.S.C. § 981(a)(1)(A), because it was involved in one or more money laundering offenses in violation of 18 U.S.C. §§ 1956 and 1957.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

6.      Venue lies in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and 1355(b)(2), because acts and omissions giving rise to the forfeiture took place in the Southern District of Florida.

7.      Venue also lies in this district pursuant to 28 U.S.C. § 1395(b), because the Defendant Asset is located in the Southern District of Florida.

## PEOPLE AND ENTITIES

8.      The Plaintiff is the United States of America.

9.      The Defendant Asset consists of real property located in a single-story condominium residence at 900 Biscayne Boulevard, Unit #6107, Miami, Florida 33132.

10.      Société Nationale des Pétroles du Congo ("SNPC") is a state-owned oil company in the Republic of the Congo.  The company manages the Congolese government's shares of oil production in Congo.

11.      Denis Sassou Nguesso ("President Nguesso") is the president of the Republic of Congo.  He became president in 1979, following a series of coups, and has held that office for approximately 35 of the last 40 years.

12.     Denis-Christel Sassou Nguesso ("Minister Nguesso") is President Nguesso's son. He is a minister of parliament in Congo—in 2017, he won reelection with 99% of the vote—and has held a number of important positions at SNPC.  From 2001-2009, Minister Nguesso was the head of various SNPC departments.   In 2010, he was appointed—by his father, President Nguesso—to serve as SNPC's "Directeur Général Adjoint en charge de l'Aval Pétrolier," Deputy Director-General of Downstream Operations, commonly abbreviated as "DGA."  As DGA, Minister Nguesso was responsible for the processing, refinement, and sale of oil extracted in Congo.  That position gave him enormous control over SNPC's activities, and, critically, its finances.  Minister Nguesso and his family members, including his father, President Nguesso, have been investigated for (and several have been charged with) corruption, money laundering, and related crimes around the world.  For instance, French authorities in 2015 seized a luxury property in Paris acquired by the Nguesso family.  In 2019, San Merino authorities seized a bank account containing approximately €19 million allegedly deposited by President Nguesso.

13.     Associate A, a U.S. resident, is the son of a former Gabonese government official and a longtime associate of Minister Nguesso.  Since at least 2009, Associate A helped Minister Nguesso transfer money into the United States and purchase and maintain assets in the United States, including within the Southern District of Florida.

14.     Danielle Ognanosso is Minister Nguesso's first wife.

15.     Nathalie Bumba-Pembe is Minister Nguesso's second wife and an authorized user of the Miami Property.

16.     The interests of Denis-Christel Sassou Nguesso and Nathalie Bumba-Pembe may be adversely affected by these proceedings.

3

## FACTUAL ALLEGATIONS

17.     Between 2011 and 2014, Minister Nguesso embezzled millions of dollars from state-owned SNPC.  He funneled the misappropriated funds into accounts in the names of his various shell companies, including Mercuria, Atlas Logistique and SCI Etoile, at the Congo subsidiary of BGFI Bank Group S.A. ("BGFI"), a Gabon-based bank.

18.     He then used a network of bank accounts in the names of shell companies and nominees to attempt to conceal the money he misappropriated from SNPC and to acquire assets, including the Miami Property.

19.     Between April 30, 2009 and April 22, 2016, Minister Nguesso transferred approximately $10.3 million to bank accounts opened by Associate A in the Southern District of Florida.  Associate A, at Minister Nguesso's direction, then used the stolen funds to acquire real estate and luxury goods for Minister Nguesso and his wives, including the Miami Property.  Once he had acquired the properties for Minister Nguesso, Associate A used additional stolen funds to cover expenses related to these properties, including property taxes, condo fees, and maintenance expenses.

I.     **Minister Nguesso Was The Gatekeeper To Congo's Oil Wealth**

20.     Congo is one of the largest petroleum producers in central Africa.  As of 2017, Congo produced 291,000 barrels of crude oil per day.  From 2012-2016, it produced, on average, approximately 94 million barrels per year, which, based on inflation-adjusted prices, translates to almost $7 billion in revenue each year.

21.     Congo exports the majority of its oil to foreign states, including to China, the European Union, and the United States.  Petroleum products accounted for 90 percent of Congo's export revenue over the past decade.

22.     The Congolese government heavily taxes oil production.  In 2013 alone, it received roughly $5 billion in taxes on oil extraction.

23.     The petroleum sector in Congo is strictly controlled.  Licenses for petroleum exploration are limited, and foreign companies are required to enter into production sharing agreements that grant shares in their ventures to the Congolese government.  In 2015, Congo enacted its Hydrocarbon Law that required oil companies to provide the Congolese government with at least 35% of the revenue from any oil extracted in Congo.

24.     SNPC, as a state-owned institution, effectively controls the Congolese petroleum sector on behalf of the government.  SNPC holds exclusive authority to issue oil and gas extraction licenses.  And, by law, SNPC owns a 15 percent stake in all of the country's oil fields, and must be given at least a 15 percent share in any joint oil exploration and production venture.  SNPC's upper management is appointed by the government, with President Nguesso having ultimate control.

25.     Over the past two decades, Minister Nguesso expanded his control over SNPC, and, by extension, the Congolese petroleum industry.  Minister Nguesso began his career at SNPC in 2001 as an executive in the company's London and Brazzaville trading branches.  In 2005, he became the managing director of one of SNPC's five subsidiaries.  And in 2010, Minister Nguesso was appointed by his father, President Nguesso, as the DGA responsible for all of SNPC's downstream operations, General Manager of the state owned refinery, and Chief Executive Officer of SNPC-Distribution.  Those positions put him in charge of SNPC's operations, and gave him broad access to the company's finances.

## II.     Minister Nguesso Abused His Position At SNPC To Misappropriate Public Funds

26.     Minister Nguesso used his control over the Congolese oil sector to embezzle millions of dollars in public funds from SNPC and extract millions more in bribes.

### A.     Minister Nguesso Misappropriated Money from SNPC.

27.     Minister Nguesso enriched himself directly from Congo's oil wealth.  Beginning in at least 2011, Minister Nguesso diverted revenue from SNPC and funds maintained in other state accounts into shell company accounts that he owned.  As an SNPC executive, minister, and son of the president, Minister Nguesso was able to simply direct BGFI Bank to transfer SNPC's (and other public) funds to his own accounts.  He did so many times.

28.     The primary destination of the funds was an account at BGFI Bank in Congo that Minister Nguesso held in the name of Mercuria (the "Mercuria Account").  Mercuria was a shell entity that Minister Nguesso used to collect the stolen SNPC funds.  He then took money from the Mercuria Account to finance his lavish lifestyle and acquire assets.  Invoices for Minister Nguesso's profligate personal spending were addressed to Mercuria.

29.     Mercuria's name resembles "Mercuria Energy Trading," a legitimate, privately-held petroleum company based in Switzerland with operations in Africa.  Minister Nguesso's "Mercuria" has no known connection to the actual company.  The Mercuria Account has no known connection to Mercuria Energy Trading.

30.     Minister Nguesso instructed the CEO of BGFI bank in Congo to transfer money from SNPC's accounts at BGFI to the Mercuria Account.  For instance:

          a.     On September 14, 2011, Minister Nguesso emailed the BGFI CEO: "Hello I kindly ask you to transfer 4,070,000,000 CFA [central African currency used in Congo]

through the special snpc account on 11-44 at profit from the mercuria account."[1]  Based on historical exchange rates, this amounted to approximately $8.3 million.

 b. In an email the next day, Minister Nguesso wrote to the BGFI CEO: "it is necessary to proceed to the settlement on the 02 'a oing' of 44.271.385.504 CFA, and then transfer to the mercuria account 4.117.550.021 CFA."  That "settlement" amounted to over $90 million.

 c. On September 16, 2011, the BGFI CEO wrote to Minister Nguesso: "the account Mercuria 12- 31 was credited with FCFA [the same as CFA] 5 467 661 380 the 14/09."  That is equivalent to approximately $11 million.  In the same email, Minister Nguesso discussed separate business matters related to SNPC.  Once again, Minister Nguesso told the BGFI CEO to simply pass money from SNPC to his own account.

 d. Later that day, the BGFI CEO confirmed that nearly $11 million related to the "invoice djeno august B/1 14 August 2011 Athenian Harmony," referencing a specific contract, oil concession, and petroleum ship, had been transferred successfully to Minister Nguesso's personal Mercuria account.  Minister Nguesso responded simply, "Ok thank you!"

 e. Also on September 16, 2011, Minister Nguesso directed the BGFI CEO: "Concerning the operation of the djeno [an oil concession] (42.010.615.221cfa), it is necessary to pass on the snpc 02 the sum 39.646.493.921 CFA, and then to pass on the account mercuria 2.464.121.300 CFA."  Once again, Minister Nguesso misappropriated funds related to oil concessions that should have gone to SNPC, and sent the equivalent of over $5 million to himself.

---

[1] Where messages involving Minister Nguesso were initially in French, they have been translated into English, and only the translation is included in this Complaint.

f.     On July 30, 2012, Minister Nguesso again instructed the BGFI CEO to transfer a portion of a payment in CFAs—roughly $1.8 million, all of which should have gone to SNPC—to his Mercuria account.

31.     To send instructions to the BGFI CEO to transfer money from SNPC to his own accounts, Minister Nguesso often used a Yahoo email account, rather than an official SNPC email address, which helped to conceal the theft.

32.     Minister Nguesso's movement and management of SNPC's funds was beyond the scope of his job as SNPC's DGA.  Ordinarily, SNPC's Directorate of Finance—rather than its DGA—dealt with SNPC's accounting and banking relationships.

33.     In addition to the above transfers, Minister Nguesso established a host of additional accounts in the names of other nominees and shell companies, including Atlas Logistique and SCI Etoile.  He then caused millions of dollars in funds to be deposited into those nominee and shell company accounts, and used the funds to purchase luxury goods, and to acquire assets in the U.S., France, and elsewhere.

**B.     Minister Nguesso Took Bribes and Engaged in Self-Dealing.**

34.     On information and belief, Minister Nguesso also accepted bribes worth over $1.5 million in exchange for awarding lucrative oil license contracts on behalf of SNPC from approximately 2014-2016.

35.     Further, he used his position of control at SNPC to ensure that companies he had an interest in were granted the status of "local partner" for lucrative oil projects.  He thus guaranteed that a portion of Congo's oil wealth flowed directly to him.  Minister Nguesso again used BGFI Bank as part of that activity.

### III. Minister Nguesso Spent Significantly More Money Than He Claimed to Earn

36. In January 2016, Minister Nguesso was questioned by CBP when he entered the United States. He was traveling with $100,000 in $100 bills, still shrink wrapped in plastic from the United States Mint.

37. Minister Nguesso (falsely) told CBP that he did not own any property in the United States.

38. Minister Nguesso also told CBP that he was employed as the Deputy Manager of SNPC, and that he received a salary of €35,000 per month, or approximately $460,000 per year.

39. But from September 20, 2007 to January 8, 2017, Minister Nguesso spent more than $29 million acquiring assets and paying for his and his family's lavish lifestyle. Each year from 2012 to 2016, he spent multiples of his purported annual income.

40. In Florida alone, Minister Nguesso spent more than $4.8 million acquiring two properties. In 2009, he purchased a property in Coral Gables for more than $2.4 million in his wife's name. And in 2012, he acquired the Miami Property for approximately $2.8 million.

41. He and his wives spent extravagantly around the world. In 2007, Minister Nguesso and his wife spent more than €150,000 (equivalent to approximately $165,000) remodeling a kitchen in one of their homes in France. The invoices were addressed to Mercuria.

42. Beginning in 2010, Minister Nguesso paid hundreds of thousands of dollars to a Geneva and Hong Kong-based aviation company for private flights for himself and his family. Again, the invoices were addressed to Mercuria.

43. In 2012, in addition to spending almost $3 million on the Miami property, Minister Nguesso paid approximately €555,098.93 or $666,000 to a Parisian kitchen designer for work relating to one of his Paris properties. The invoices were addressed to Mercuria.

44.    In 2013, Minister Nguesso spent €501,900 or approximately $650,000 during a stay at a hotel in Los Angeles.  The expenses were billed to Minister Nguesso by a French firm via an invoice from a Hong Kong company issued to Mercuria.  That same year, Minister Nguesso also purchased three Range Rover automobiles (which retail at over $60,000 each) with funds in the Mercuria Account and had the dealer invoice the transaction to Mercuria.

45.    In 2014, Minister Nguesso purchased approximately €1.4 million worth of jewelry for his wife in Paris.  Minister Nguesso also spent approximately €110,000 to purchase a Patek Philippe model 5961R watch for himself in Paris.  He used a bank account in the name of his bodyguard, Charly Gaulbert Elenga, to wire the funds, and used the name of a nominee to complete the purchase.  In September 2014, Minister Nguesso received an invoice, again addressed to Mercuria, for €713,684 (approximately $788,431) for a private flight and other travel expenses he incurred in connection with a trip to Miami.

46.    In 2015, Minister Nguesso spent €546,000 or approximately $589,000 to pay the fees of a Parisian architect for work relating to one of his Paris properties.  The bill was made out to Atlas Logistique.

47.    In 2016, Minister Nguesso spent approximately $857,000 using Atlas Logistique's BGFI bank account to acquire seven black Cadillac Escalades and ship them to Congo.

48.    In addition to the above transactions, between 2011 and 2016, Minister Nguesso imported at least $3,690,447 in *cash* into the United States—and that's just what he declared to CBP.  Minister Nguesso never reported removing any currency from the United States, as he would have been required to do pursuant to 31 U.S.C. § 5316 had he transported more than $10,000 in cash out of the United States.

## IV.   Minister Nguesso Purchased The Miami Property With Funds Traceable To Funds He Misappropriated From SNPC

49.     Minister Nguesso's "extra" money came from the corruption, self-dealing, and theft from SNPC described above.  He used the money he took from SNPC specifically to purchase the Miami Property.

50.     The first step was to get the money into the United States.  Beginning in at least 2009, Minister Nguesso began wiring money from the Mercuria Account and other accounts under his control in the Congo to bank accounts in the United States.

51.     Minister Nguesso had opened accounts in the United States for himself.  When he did so, he tried to disguise his ownership.  He opened four accounts at Bank of America between 2013 and 2016, for instance, using his alias, Denis Christelle.[2]  When he did so, he lied about his job and his income.  He stated that he was a "manager" for a company called "Merchurrea."  He also claimed falsely that his annual salary was only $50,000.  Minister Nguesso never disclosed to Bank of America that he was a Congolese public official or that he was President Nguesso's son. He took those steps in an effort to hide the source and nature of the funds that went into his accounts.

52.     Beginning in 2011, Minister Nguesso generally did not use his own accounts, even in the name of an alias, to transfer the stolen funds into the United States.  Instead, he almost always used accounts that had been opened by, and were in the name of, his associate and nominee, Associate A.[3]

---

[2]     Minister Nguesso used a second Congo passport under the name Denis Christelle to open the bank accounts and make purchases in the U.S. in an attempt to conceal his identity. Minister Nguesso used his actual passport when entering the country.

[3]     The limited exception is that Minister Nguesso did transfer funds to an account at Bank of America listed under his alias, Denis Christelle, to pay certain bills for the Miami Property.

53.     Associate A had two accounts at Bank of America that Minister Nguesso used. From 2009 to 2016, Minister Nguesso wired, via his shell companies, over $8.9 million into Associate A's Bank of America checking account, and sent over $1.5 million from his personal account.

54.     The transfers are summarized in this table:

**Wire Transfers Sent By Minister Nguesso to Associate A's U.S. Bank Accounts**

| Date | Source | Amount |
| --- | --- | --- |
| 4/30/2009 | Sassou Nguesso Denis | $600,000.00 |
| 5/29/2009 | Sci De L'Etoile | $1,892,374.45 |
| 2/9/2010 | Sassou Nguesso Denis | $125,275.00 |
| 6/15/2010 | Sassou Nguesso Denis | $330,920.00 |
| 10/15/2010 | Sassou Nguesso Denis | $145,000.00 |
| 10/25/2010 | Sassou Nguesso Denis | $250,500.00 |
| 1/26/2011 | Sassou Nguesso Denis | $100,000.00 |
| 7/7/2011 | Elenga Charly Gaulbert | $385,000.00 |
| 11/18/2011 | Sci Etoile | $93,000.00 |
| 2/16/2012 | Mercuria | $100,000.00 |
| 6/4/2012 | Mercuria | $105,000.00 |
| 6/5/2012 | Sci Etoile | $327,500.00 |
| 7/18/2012 | Sci Etoile | $209,500.00 |
| 8/22/2012 | Mercuria | $3,589,543.00 |
| 4/23/2013 | Sarl Atlas Logistique | $222,000.00 |
| 12/24/2013 | Atlas Logistique | $219,100.00 |
| 1/6/2014 | Sarl Atlas Logistique | $1,000,000.00 |
| 2/24/2015 | Atlas Logistique | $150,000.00 |
| 3/17/2015 | Sarl Atlas Logistique | $60,000.00 |
| 9/16/2015 | Atlas Logistique | $300,000.00 |
| 4/22/2016 | Atlas Logistique | $169,500.00 |
| **Total** | | **$10,374,212.45** |

55.     Minister Nguesso sent the money to Associate A's accounts in an attempt to launder it and conceal the source and nature of the funds.

56.     In August 2012, Minister Nguesso used some of that money to purchase the Miami Property, a penthouse condo with floor-to ceiling windows and a sweeping view of Miami's Biscayne Bay, the Atlantic Ocean, and the Miami skyline.  The condo has over 3,500 square feet

including three terraces, three large bedrooms, and five bathrooms.  It was listed for sale at $2.4 million.

57.     To make the purchase, on August 22, 2012, Minister Nguesso transferred $3,589,543 from the Mercuria Account to Associate A's Bank of America checking account in Miami.  Before that transfer, the balance in Associate A's Bank of America account was approximately $150,000.

58.     The money in the Mercuria Account had previously been stolen from SNPC.  As noted above in Paragraph 30(f), less than a month earlier, on July 30, 2012, Minister Nguesso had diverted approximately $1.8 million from SNPC's account to the Mercuria Account.

59.     For this and other transfers, Minister Nguesso directed Associate A to create fraudulent invoices that would explain the transfer of funds.  Associate A complied, creating a bogus $3,589,543 invoice from an entity he controlled to Minister Nguesso for kitchen appliances and other expenses.

60.     On September 6, 2012, Associate A transferred $50,000 of the funds to an attorney in Florida for the down payment for the purchase of the Miami Property.

61.     On October 3, 2012, Associate A sent $2,334,933.64 of those funds to the same Florida attorney to complete the acquisition.

62.     Minister Nguesso took multiple additional steps to conceal his ownership of the Miami Property.  First, the sales contract for the Miami Property identified Associate A alone as the property's purchaser.  At closing, the property was recorded as belonging to Associate A and Denis Christelle, Minister Nguesso's alias.

63.     Associate A's ownership was a sham—he transferred his interest in the Miami Property to "Denis Christelle" the day the sale closed.  Minister Nguesso and one of his wives, Nathalie Bumba-Pembe were listed as having access to the property from the outset.

64.     Minister Nguesso had used Associate A as a front to complete the transaction and obscure his involvement.  Minister Nguesso's use of the Mercuria Account, rather than one in his own name, assisted him in concealing his identity and the nature of the stolen funds.

65.     Associate A used his identity, rather than Minister Nguesso's, to renovate the Miami Property.  Associate A applied for permits to renovate the apartment in his name (rather than Minister Nguesso's), including in February 2013.  And he signed construction contracts, including in December 2012.  Minister Nguesso's name (even his alias) was entirely absent from those records.  Associate A paid for the renovations, using his Bank of America account, with money that had originally come from the Mercuria Account.

66.     Between November 2012 and May 2013, Associate A paid $207,500 to an interior designer with whom both Associate A and Minister Nguesso exchanged emails concerning the Miami Property.

67.     Associate A also paid the property taxes for the Miami Property using SNPC money that had been transferred to his Bank of America account via Mercuria.  From 2012-2016, Associate A wrote checks totaling $133,144.71 with funds traceable to the Mercuria Account to pay taxes on the Miami Property.

68.     On June 13, 2016, Minister Nguesso purchased a cashier's check for $49,230.13 from Bank of America to pay property taxes for the Miami Property using his alias.

69.     On September 22, 2016, Minister Nguesso, again using his alias, transferred his interest in the Miami Property to Nathalie Bumba-Pembe, his second wife.

70.     The transfer was not for value.  Instead, Minister Nguesso's transfer of the Miami Property to Nathalie Bumba-Pembe—and his use of accounts in the name of Associate A and his alias—was meant to conceal Minister's Nguesso's true ownership.

71.     The foregoing actions were designed to conceal or disguise the nature, location, source, ownership, and control of the funds Minister Nguesso had misappropriated from SNPC and used to acquire and maintain the Defendant Asset.

## V.     Minister Nguesso Purchased Other Properties Using A Similar System of Misdirection and Nominees

72.     Minister Nguesso followed the same pattern in acquiring real property in Coral Gables, Florida (the "Coral Gables Property").  In 2009, he began wiring money from an account he controlled at BGFI Bank in the name of a shell company, SCI Etoile, to Associate A's Bank of America checking account.  On April 30, 2009, Minister Nguesso wired $600,000 to Associate A's Bank of America account.  And on May 29, 2009, he sent another $1,892,374.45.  Before those transfers, the balance in Associate A's accounts at Bank of America was under $130,000.

73.     Minister Nguesso sought to hide his ownership and control of the Coral Gables Property by recording its ownership in the name of Danielle Ognanosso, the alias of his first wife, Danielle Ognanosso Sassou Nguesso.  She was a nominee, however.  She told French authorities in 2016 that she did not own any property in the United States.  She also denied knowledge of the entity SCI Etoile.

74.     Minister Nguesso also directed BGFI to remove his name from a bank document related to the purchase.  In an April 23, 2009, email to the BGFI CEO, Minister Nguesso requested the preparation of a financial solvency letter on Ognanosso's behalf.  The next day, Minister Nguesso sent another email to the BGFI CEO, "It is necessary to remove from the certificate the mention of Sassou Nguesso; just put Mrs. Daniele Ognanosso."

75. Following the purchase of the Coral Gables Property, Associate A, at Minister Nguesso's direction, paid for the property's upkeep from funds that Minister Nguesso funneled into Associate A's Bank of America account.

76. Minister Nguesso also used his shell companies to pay for upkeep. For instance, he sent a wire for $34,000 from Atlas Logistique on April 15, 2015 to cover household expenses relating to the Coral Gables Property.

77. Again, Minister Nguesso engaged in these transactions to hide his relation to the money and to conceal its source.

78. Minister Nguesso also purchased and renovated property in France using the same system of shell companies and nominees to shift and hide funds. Minister Nguesso used bank accounts under the name of his bodyguard, Elenga, in his property dealings in France. Just as with the Miami Property and Coral Gables Property, Minister Nguesso did all of this to conceal the nature and source of the funds used to acquire the properties, as well as his ultimate ownership.

## FOREIGN LAW BASIS FOR FORFEITURE

79. Misappropriation of public funds is a criminal offense under Congolese law, as enumerated by the Penal Code of Congo, including Articles 177 and 178.

80. The Penal Code of Congo prohibits the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official. The Penal Code provides the following:

    a. Article 177 prohibits government officials from "using their power of their ranks for corruption."

    b. Article 178 prohibits any person from requesting or agreeing to receive offers or presents in order to obtain awards, positions, jobs, or favors granted by the public authorities, entities, or profits which abuse or influence favorable decisions.

81.     The Constitution of the Republic of Congo also prohibits corruption and further defines corruption under Congolese law:

a.      Article 53 of the Constitution provides: "The property of the State is sacred. Property in the public domain is inalienable, non-transferable, imprescriptible, and unseizable.  Every citizen must respect and protect [the state property]."

b.      Article 54 of the Constitution also provides: "Any act of sabotage, vandalism, corruption or squandering or denigration of public funds is prohibited and punished by the conditions laid down by law."

**FIRST CLAIM FOR RELIEF**

18 U.S.C. § 981(a)(1)(C)

82.     Paragraphs 1 through 81 above are incorporated by reference as if fully set forth herein.

83.     The Defendant Asset is property that constitutes, or is derived from, proceeds traceable to a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)), and the international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), which are specified unlawful activities under 18 U.S.C. §§ 1956(c)(7)(A) and 1956(c)(7)(B)(iv), or a conspiracy to commit such offenses.

84.     Therefore, the Defendant Asset is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)

85.     Paragraphs 1 through 81 above are incorporated by reference as if fully set forth herein.

86.     The Defendant Asset is involved in, or is traceable to property involved in, a transaction or attempted transaction in violation of section 18 U.S.C. § 1957.  Specifically, the Defendant Asset is involved in or is traceable to a monetary transaction in criminally derived property of a value greater than $10,000, that is a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)), and the international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314).

87.     Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)

88.     Paragraphs 1 through 81 above are incorporated by reference as if fully set forth herein.

89.     The Defendant Asset is involved in, or is traceable to property involved in, a transaction or attempted transaction in violation of section 18 U.S.C. § 1956(a)(1)(B)(i). Specifically, the Defendant Asset is involved in or traceable to a financial transaction involving the proceeds of specified unlawful activities, that is a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)), and the international transportation or receipt of stolen or

fraudulently obtained property (18 U.S.C. § 2314f), and which was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

90.     Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FOURTH CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)

91.     Paragraphs 1 through 81 above are incorporated by reference as if fully set forth herein.

92.     The Defendant Asset is involved in, or is  traceable to property involved in, a transaction or attempted transaction in violation of section 18 U.S.C. § 1956(a)(2)(B). Specifically, the Defendant Asset is, or is traceable to, funds that were, transported, transmitted, or transferred to a place in the United States from or through a place outside the United States, knowing that the funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities, that is a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)), and the international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314).

93.     Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FIFTH CLAIM FOR RELIEF

18 U.S.C. § 981(a)(1)(A)

94.     Paragraphs 1 through 81 above are incorporated by reference as if fully set forth herein.

95.     The Defendant Asset is involved in, or is traceable to property involved in, a conspiracy to launder the proceeds of specified unlawful activities in violation of 18 U.S.C. § 1956(h).  Specifically, the Defendant Asset is involved in, or is traceable to funds that were involved in, a conspiracy:  (1) to conduct and/or attempt to conduct financial transactions which involve the proceeds of specified unlawful activities, that is a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)), and the international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314); (2) to engage and/or attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activities, that is a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)), and the international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), in violation of 18 U.S.C. § 1957; and (3) to transport, transmit, or transfer to a place in the United States from or through a place outside the United States, knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities, that is a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official

20

(18 U.S.C. § 1956(c)(7)(B)(iv)), and the international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

96.   Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, Plaintiff, the United States of America, requests:

1.   The Defendant Asset be proceeded against according to the law and the rules of this Court, and that due notice be given to all the interested parties to appear and show cause why forfeiture should not be decreed.

2.   The Court, for the reasons set forth herein, adjudge and decree that the Defendant Asset be forfeited to the United States of America and disposed of in accordance with existing laws, together with costs, and for such other relief as this Court deems proper and just.


Respectfully submitted,


DATED: June 12, 2020          DEBORAH CONNOR, CHIEF
                              MONEY LAUNDERING & ASSET RECOVERY
                                  SECTION

                              Woo S. Lee, Deputy Chief
                              Shai D. Bronshtein, Trial Attorney
                              Teresa C. Turner-Jones, Senior Trial Attorney
                              Criminal Division
                              United States Department of Justice
                              1400 New York Avenue NW
                              Washington, DC 20005
                              Telephone: (202) 616-5950
                              Shai.Bronstein@usdoj.gov

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY:     */s/ Adrienne E. Rosen*
        Adrienne E. Rosen
        Assistant United States Attorney
        Court ID No. A5502297
        U.S. Attorney's Office
        99 NE 4th Street, 7th Floor
        Miami, Florida 33132
        Telephone: (305) 961-9338
        Facsimile: (305) 536-4089
        Adrienne.Rosen@usdoj.gov

        Attorneys for Plaintiff
        UNITED STATES OF AMERICA

## **VERIFICATION**

GEOFFREY I. GORDON, being of legal age, verifies, and pursuant to 28 U.S.C. § 1746(2), declares and states as follows:

1.     I am a special agent with Homeland Security Investigations, U.S. Department of Homeland Security, and am assigned to the investigation in this case.

2.     I have reviewed the foregoing Verified Complaint for Forfeiture *in Rem* and know the contents thereof and that the matters contained in the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

3.     The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, publicly available files and historical information, information supplied to me by other law enforcement officers, experts, and other witnesses, as well as my investigation of this case, together with others, as a special agent.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on June/2 , 2020.

Geoffrey I. Gordon
Special Agent
Homeland Security Investigations